1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

ROY C. RIVAS, Jr.,

11

Petitioner,

12

13
vs.

14

STUART J. RYAN, Warden,

15

16

Respondent.

17

18

Civil No.            04cv1154 J (JMA)

**REPORT AND RECOMMENDATION RE:**

**(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS;**

**(2)  DENYING PETITIONER'S MOTION TO EXPAND THE RECORD; and**

**(2) DENYING PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING.**

19

I.       **INTRODUCTION**

20

Roy C. Rivas, Jr., ("Rivas") a state prisoner proceeding pro se, has filed a Petition for Writ of

21

Habeas Corpus (the "Petition") pursuant to 28 U.S.C. § 2254 challenging his San Diego Superior Court

22

conviction in case number CRN 26227 for first degree murder, attempted robbery, and residential

23

burglary. (Lodgment No. 15 at 001-05.) He contends that his federal constitutional right to an impartial

24

jury and his Sixth Amendment right to confront and cross-examine the witnesses against him were

25

violated.  He also claims that his federal due process rights were violated when the prosecutor presented

26

false evidence and put on  a witness who was bound to a "script" as a condition of her plea agreement,

27

and he alleges that the cumulative effect of the errors requires reversal of his conviction.  (*See* Pet'rs

28

Mem. of P. & A. at 8-37.)

1   Finally, Petitioner asks this Court to hold an evidentiary hearing and to expand the record. (*See* doc.

2   nos. 48, 51.)

3        The Court has considered the Petition and Exhibits, Respondent's Answer, Petitioner's Traverse

4   and all the supporting documents submitted by the parties. Based upon the documents and evidence

5   presented in this case, and for the reasons set forth below, the Court recommends that the Petition, the

6   motion for an evidentiary hearing and the motion to expand the record be **DENIED**.

7   **II.    FACTUAL BACKGROUND**

8        This Court gives deference to state court findings of fact and presumes them to be correct;

9   Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28

10  U.S.C.A. § 2254(e)(1)(West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings

11  of historical fact, including inferences properly drawn from such facts, are entitled to statutory

12  presumption of correctness). The facts as found by the state appellate court are as follows:

13                                            FACTS

14        At around 10 a.m. on May 29, 1993, Rivas and four others went to the two-story
          apartment of Elpidio Beltran and his wife, Sofia Partida, to rob Beltran and take his
15        drugs. In the process, while Rivas used a gun to hold people downstairs in the apartment
          at bay, Ray Senteno went upstairs and shot and killed Beltran in the presence of Partida
16        and the couple's six-year-old son, Elpidio Beltran, Jr. [footnote 2:  In a separate trial,
          Ray Senteno was convicted of first degree murder, attempted robbery and residential
17        burglary, and found to have used a gun. He was sentenced to prison for 31 years to life.]

18
          Earlier that morning, Patsy Moreno and Gloria Rivas (Gloria), Rivas's aunt, had
19        purchased heroin and cocaine from Beltran at the apartment where Gloria had been
          buying drugs for over a month. In the past, when Gloria was short of money for drugs,
20        Beltran had given her a list of things to steal and deliver to him as payment. This time,
          Gloria wanted her drugs, and she was not going to steal in order to get the drugs. Gloria
21        handed Beltran the money she had, only $30, for the $40 worth of drugs he furnished
          her, and she and Moreno "just took off" with the drugs since they were outside the
22        apartment and she knew he did not want to cause a scene.

23        After Gloria and Moreno returned home, they used the drugs. A short time later,
          Rivas arrived with Senteno and Nancy Jaime. Gloria told Senteno, then Rivas, that she
24        wanted to rob Beltran because he had a lot of drugs. The three of them planned to scare
          Beltran, tie him up with duct tape and get his drugs. Senteno loaded a gun, and Gloria
25        looked for bullets to load hers, after which the five people went in Moreno's car to
          Beltran's apartment.

26
          When they arrived at the apartment, Gloria and Senteno were admitted, followed
27        shortly by Rivas who proceeded to point a gun at a male friend of Sofia Maldonado, one
          of the Beltrans' children. [footnote 3: Gloria first testified that the gun Rivas used was
28        an inoperable .25 caliber gun which she had placed in the back seat of the car. After
          admitting she had not told the whole truth in her earlier testimony because she did not

want to get her nephew, Rivas, in trouble, Gloria testified she, Rivas and Senteno each had a gun, and the "little pistol" Rivas used was not her gun.] Rivas, who held a roll of duct tape in his hand, also pointed the gun at Maldonado. Gloria said they were the police, unplugged a telephone in the kitchen and stopped a boy who was trying to run out a patio door after seeing the guns. Gloria testified that Jaime also entered and participated by closing the curtains.

While Rivas, Gloria and Jaime were holding the people at bay downstairs, six-year-old Elpidio Beltran, Jr., ran upstairs and altered his parents about the events. With his gun drawn, Senteno went to the upstairs bedroom where Beltran and Partida were watching a video, and shot and killed Beltran. When the shots were fired, all the intruders fled.

Rivas's defense was that he went to the apartment to buy drugs, not to commit a robbery or burglary. He presented testimony of the shooter, Senteno, to the effect the two of them got "high" on heroin earlier on the morning of the killing, and later, when Gloria told them she just bought drugs, they asked her to introduce them to her supplier. Senteno had about $300. Gloria told them the name of her supplier and they went to the apartment to buy drugs. Before leaving, Senteno put a 15-round clip in his gun and took it with him because he did not know this dealer and was concerned about being robbed. When Senteno and Gloria went into the apartment, Senteno had the gun in his waistband. A young boy saw the gun and began yelling that there was a gun, after which he ran upstairs. Senteno took the gun in his hand and ran upstairs to tell Beltran everything was all right, he was just there to buy drugs. Senteno stated he tapped the gun on the door and it went off two or three times. He saw he had shot Beltran, and panicked, running downstairs and telling Rivas the gun went off, then leaving with the others.

On cross-examination the prosecutor brought out the fact Senteno had been separately convicted of the same charges arising from the killing, that he had served four or five years in prison for other convictions, that he knew his possession of a firearm and use of heroin were parole violations, and that on about seven occasions in the past he gave false names and social security numbers to the police in order to avoid parole violations.

(Lodgment No. 3, *People v. Rivas*, slip op. no. D021952 at 3-6.)

## III.   <u>PROCEDURAL BACKGROUND</u>

The San Diego County District Attorney's Office filed an information charging Roy Rivas, Jr. with one count of first degree murder (count 1), a violation of California Penal Code ("Penal Code") section 187(a), one count of attempted robbery (count 2), a violation of Penal Code sections 664, 211 and 213(b) and one count of residential burglary (count 3), a violation of Penal Code section 459. (Lodgment No. 15 at 0001-5.)[1] As to counts two and three, the information also alleged that Rivas

---

[1] Although Rivas did not fire the fatal shot at Beltran, he was charged with first degree murder under the California's felony murder doctrine. Essentially, the felony murder doctrine provides that a defendant may be found guilty of first degree murder when he commits, among other crimes, a residential burglary or robbery, and someone is killed during the commission of the crime. (*See* CALJIC Nos. 8.10 (Murder Defined), 8.27 (First Degree Felony Murder – Aider and Abettor)

1    personally used a firearm, within the meaning of Penal Code section 12022.5(a).   Finally, the

2    information alleged that Rivas had suffered four prior prison commitments within the meaning of Penal

3    Code section 667.5(b).[2]   (*See id.*)   A jury found Rivas guilty of all counts and found the Penal Code

4    section 12022.5(a) allegations to be true.  (*Id.* at 0111-3.)  Rivas later admitted the four prior convictions

5    alleged and was sentenced to thirty-three years to life.  (*Id.* at 0156.)

6            Rivas filed a direct appeal and a habeas corpus petition challenging his conviction and sentence

7    in the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgment Nos. 1, 7, 8, 9,

8    11, 12, 13.)   On April 26, 1996, the state appellate court issued an Order directing the San Diego

9    Superior Court to conduct an evidentiary hearing into Rivas' allegation that he was denied a fair trial

10   because of juror misconduct by the foreman, Rudy Medina, who did not disclose during voir dire a

11   romantic relationship with Rivas' mother 25 years prior.  (Lodgment No. 2(a).)  The Order directed the

12   court to answer five questions and stayed the appeal pending resolution of the issues argued in the

13   habeas corpus petition.  (*Id.*)

14            The Superior Court held an evidentiary hearing, during which several witnesses testified, on

15   July 9, 1996.  (*See* Lodgment No. 2(b).)  Following the hearing, the court issued an opinion which

16   contained both legal and factual findings and concluded that Rivas was not denied a fair trial.  (*See*

17   Lodgment No. 5 at Ex. F.)  In an unpublished opinion, the state appellate court upheld Rivas' conviction

18   but found that imposition of a sentence enhancement for one of Rivas' prior convictions was improper

19   and reduced his sentence to twenty-nine years to life.  (Lodgment No. 3.)

20            Rivas next filed a habeas corpus petition in the California Supreme Court, which he later

21   withdrew.  (Lodgment No. 4.)  He filed a second habeas corpus petition in the California Supreme Court

22   which was denied without citation of authority.  (Lodgment Nos. 5.)

23            Rivas filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 (West 2006) in this Court on

24   June 9, 2004 [doc. no. 1].  Respondent filed a motion to dismiss on November 3, 2004, which was

25

26            [2]  The Information contained another Penal Code section 12022.5(a) allegation that was later dismissed.
     (*See* Lodgment No. 15, Clerk's Tr. at 0152.)  The Information also charged Rivas with being an accessory after
27   the fact (count 4), a violation of Penal Code section 32; evading an officer with reckless driving (count 5), a
     violation of Vehicle Code section 2800.2; possession of an assault weapon (count 6), a violation of Penal Code
28   section 12280(b); and possession of a destructive device (count 7), a violation of Penal Code section 12303.2.
     Counts six and seven were severed and later dismissed. (*See id.* at 0156.)  Although there is no indication in the
     record, counts four and five were apparently dismissed at some point during the proceedings.

denied on September 29, 2005 [doc. nos. 26 (Report and Recommendation), 33 (Order Adopting Report

and Recommendation)].  Respondent filed an Answer on March 15, 2006, and Rivas filed a Traverse

and a Motion to Expand the Record on June 6, 2006 [doc. nos. 49, 50, 51].

**IV.**   **DISCUSSION**

   **A.**   **Scope of Review**

   Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal

habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 1994) (emphasis added).

   The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996

("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).   As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

   To obtain federal habeas relief, Rivas must satisfy either § 2254(d)(1) or § 2254(d)(2).  *See*

*Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

1  *Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

2  / / /

3          Where there is no reasoned decision from the state's highest court, the Court "looks through"

4  to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the

5  dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must

6  conduct an independent review of the record to determine whether the state court's decision is contrary

7  to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223

8  F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes*

9  *v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court

10  precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as

11  neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]"

12  *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*

13          **B.      Analysis**

14          Rivas raises five claims[3] in his Petition: (1) his federal constitutional right to a fair trial was

15  violated due to juror misconduct when the jury foreman failed to inform the trial judge of his prior

16  relationship with Rivas' mother; (2) his Sixth Amendment right to confront and cross-examine witnesses

17  was violated when the trial court admitted hearsay statements by Patsy Moreno; (3) his Sixth

18  Amendment due process and fair trial rights were violated when the prosecution's star witness, Gloria

19  Rivas, testified pursuant to a "script" provided by the prosecution; (4) his federal constitutional right

20  to a fair trial was violated when the prosecutor introduced false evidence; and (5) the cumulative effect

21  of all the errors requires reversal.  (*See* Pet'rs Mem. of P. & A. at 8-37.)

22          Respondent argues, as he did in the Motion to Dismiss, that the Petition is time-barred.  (Answer

23  at 5-8.)  As to the merits of the Petition, Respondent argues that the state court's rejection of Rivas'

24  claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court

25  law.  (*Id.* at 8-25.)

26          1.      Timeliness of the Petition

27

28  _____

          [3]  Although Rivas' Memorandum in Support of his Petition lists six claims, the Court concludes that
claims one and two are essentially two aspects of the same claim.

1    Respondent contends that intervening case laws renders this Court's previous determination that

2  the Petition is timely incorrect.  Specifically, Respondent argues that in *Evans v. Chavis*, 546 U.S. 189

3  (2006), the Supreme Court ruled against the rationale used by this Court when it concluded the Petition

4  was timely.  (Answer at 5-8.)  However, because this Court has already determined that the Petition is

5  timely, and because the Court recommends denying the Petition on the merits, the Court declines to

6  exercise its discretion to reexamine the timeliness question in light of *Evans*.  *See Jeffries v. Wood*, 114

7  F.3d 1484, 1488, *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that the

8  law of the case is a discretionary doctrine which describes the general practice of courts refusing to

9  reopen what has been decided); *see also Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir. 1993).

10    2.    <u>Juror Misconduct</u>

11    Rivas argues that he was denied a fair trial because the jury foreman, Rudy Medina, deceived

12  the court by failing to disclose during voir dire that he had a romantic relationship with Rivas' mother,

13  Rita Reith, about twenty-five years before Rivas' trial which, according to Reith, had ended

14  acrimoniously.  At the beginning of jury selection, the panel was asked whether they knew any of the

15  participants in the case.  Medina did not respond.  (Lodgment No. 14 (July 18, 1994 Rep's Tr.) at 11-

16  13.)  Later, Medina told the bailiff during a break in the proceedings that he thought he knew Rivas'

17  mother twenty-five years ago.  (Lodgement No. 14 (July 19, 1994 Rep's Tr.) at 80.)  When Medina was

18  in the jury box being questioned by the judge, he was asked how he knew Rivas' mother:

19    THE COURT: Let's talk about that at the beginning here.  How did you know
    her at that time?

20

21    PROSPECTIVE JUROR NO. 9: We worked for the same company.

22    THE COURT: What company?

23    PROSPECTIVE JUROR NO.: Deutch Company in Oceanside.

24    THE COURT: What kind of work?

25    PROSPECTIVE JUROR NO. 9:  Electronic components.

26    THE COURT: How long did you know her at that company?

27    PROSPECTIVE JUROR NO. 9: Two or three years.

28    THE COURT: Were there events in your life that cause you to know her and her
    family socially during that time.

1      PROSPECTIVE JUROR NO. 9: Not really.

2      THE COURT: Company picnics?

3      PROSPECTIVE JUROR NO. 9: Yeah.

4      THE COURT: Any clear memory or recollection of you meeting with, speaking
       with, or having any relationship with any of her family members?

5

6      PROSPECTIVE JUROR NO. 9: I believe I saw him when he was a small child,
       five, six or seven years old.

7      THE COURT: Do you feel that particular association you [sic] find yourself
       having some feelings of loyalty, allegiance, partiality of any sort that would affect you

8      here?

9      PROSPECTIVE JUROR NO. 9: That was 25 years ago.

10     THE COURT: What made you realize you probably knew the parties?

11     PROSPECTIVE JUROR NO. 9: We sat up here, I just heard the charges and the
       name kind of rang a bell and I started thinking back.

12

13     THE COURT: When you started thinking back, did you recall in May '93 having
       read a newspaper article thinking you might have known –

14     PROSPECTIVE JUROR NO. 9: I don't remember reading anything in the paper.

15     THE COURT: The reason I say that, it might be part of the reason why it rang
       a bell.  Sometimes we pick up a newspaper and say I know that person or know that

16     family.  It may be someone you don't see in 20 years.  You don't recognize that event?

17     PROSPECTIVE JUROR NO. 9: No.

18     THE COURT: There is enough similarities you think that is the case here?

19     PROSPECTIVE JUROR NO. 9: Yes.

20     THE COURT: Other than that, the association didn't continue over the years?

21     PROSPECTIVE JUROR NO. 9: No.

22  (*Id.* at 80-81.)

23     Medina was later questioned by Rivas' attorney, Richard Boesen.  Boesen asked Medina some

24  follow-up questions regarding his relationship with Rivas' mother:

25     MR. BOESEN: Mr. Medina, you talked to the judge about knowing Ms. Rivas
       [Reith] at some point in time, a long time ago.  What was your relationship with her at

26     that time?

27     PROSPECTIVE JUROR NO. 9: I was her supervisor at work.

28     MR. BOESEN: Any opportunity to share family secrets or family history?
       Anything about her personal life during the course of that relationship?

PROSPECTIVE JUROR NO. 9: Not a whole lot, some.

MR. BOESEN: I'm sorry?

PROSPECTIVE JUROR NO. 9: Some.

MR. BOESEN: Anything in a personal nature you feel you could share with us?

PROSPECTIVE JUROR NO. 9: No.

(*Id.* at 146.)

In support of this claim, Rivas submitted to the state appellate court a declaration executed by Reith in which she stated that she did not discover Medina was on Rivas' jury until after Rivas was convicted and that she was involved in a "serious romantic relationship" with Medina about twenty-two years before which "ended very badly because Mr. Medina refused to divorce his wife and marry me." (Lodgement No. 7, Ex. A.) Reith also alleged that Medina's wife Socorro threatened Reith after Socorro found out about the relationship between Medina and Reith. (*Id.*)

As previously noted, in response to Rivas' claim, the state appellate court directed the state superior court to hold an evidentiary hearing and directed the court to answer five questions:

(1) Whether Juror Rudy Medina in fact had a romantic relationship with [Rivas'] mother. If so,

(2) What were the circumstances of the relationship and its termination, including whether there was any lasting influence on Medina?

(3) Did Medina tell the whole truth in answering the court's and Rivas's counsel's questions of him during the voir dire?

(4) What, if any, justification was there for Medina's nondisclosure of the relationship with [Rivas'] mother in response to the questions asked during voir dire by the court and Rivas's counsel?

(5) Did Medina's nondisclosure operate to deprive Rivas of his rights to challenge a prospective juror for cause or to exercise a peremptory challenge (see *In re Hitchings* (1993) 6 Cal.4th 97, 111-112)?

(*See* Lodgment No. 2(a).)

Six witnesses testified at the hearing: Reith, Medina, Medina's wife Socorro, Reith's friend Eufemia Sainz, Reith's aunt Mary Gonzales, and Reith's current husband Kenneth. (Lodgment No. 2(b).) Reith stated that Medina was her supervisor at Deusch Electronics and that she began dating him in 1967. (*Id*. at 55.) Medina told her he was divorced and they saw each other a few times a week. (*Id.*

-9-

at 59.) The relationship was intimate and lasted about four months. (*Id.* 59-60.) Reith also testified that Medina asked her to marry him and have children with him, but that she declined because she had been through a bad marriage and she did not believe Medina could be faithful. (*Id.* at 61-62.)[4]  After about four months, Reith received a phone call from a woman identifying herself as Socorro Medina. (*Id.* at 67.) The woman told Reith to tell Medina to come home. (*Id*. at 70.) Reith received a second phone call from the woman during which the woman told Reith she should not be dating her husband, that he was married with children, and that she should leave Medina alone "or else." (*Id.* at 70-72.) Reith also received a card on her birthday which she attributed to Socorro which contained bad language. (*Id.* at 72-74.) Reith and Medina subsequently broke up. (*Id.* at 70.) Reith claimed Medina spoke roughly to her and that he was angry over the breakup. (*Id.* 85-86.) Sainz, Gonzalez and Kenneth Reith all testified they believed that Reith and Medina were involved in a serious relationship. (*Id.* at 6-45, 165.)

Medina's testimony contradicted Reith's with regard to the nature of their relationship. Although Medina admitted he had an intimate relationship which lasted five or six months with Reith about twenty-five years before, he testified that the relationship was not serious and that he had never asked Reith to marry him or have his children. (*Id.* at 187-89.) He also testified that he was not angry as a result of their breakup, that it was not traumatic and that there were no hard feelings on either side. (*Id.* at 193-97.) Socorro Medina contradicted Reith as well, denying having had any contact with Reith. (*Id.* at 180.)

Following the hearing, the trial court issued a detailed opinion. Answering the court of appeal's first and second questions, the court concluded that Medina had been in a romantic relationship with Reith which lasted four to six months. (Lodgment No. 5, Ex. F at 1.) The court concluded, however, that Reith's testimony regarding the nature of the relationship was not credible "in light of Mr. Medina's statements" and because "Mrs. Reith herself admitted that she was not serious about the relationship and would not have married Mr. Medina because she did not trust him to be faithful." (*Id.* at 1-2.) The court characterized the relationship as "a casual dating relationship" and a "physical/sexual relationship" (*Id.* at 1-2.) The court also found that the relationship did not end acrimoniously, pointing out that Reith

---

[4]  This was in contradiction to her declaration, in which she stated that the relationship ended badly because Medina refused to marry her. (Lodgment No. 7, Ex. A.)

04cv1154

1   admitted it did not.  Further, the court found that Reith's claim that Socorro Medina threatened her was

2   incredible, and, because Reith did not tell Medina about the alleged threats, did not have any effect on

3   Medina.  (*Id.* at 2-3.)  Considering these findings, the court concluded that his relationship with Reith

4   did not have a lasting influence on Medina.  (*Id.* at 3.)

5        As to the appellate court's third question, the superior court concluded that Medina had been

6   truthful in his answers regarding his relationship with Reith.  (Lodgment No. 5, Ex. F at 3.)  The

7   superior court found that  "[w]hile Medina did not reveal all the facts which he could have revealed on

8   voir dire, he did not lie in response to any voir dire question."  (*Id.*)  The court reasoned that although

9   Medina was not "wholly truthful" when he responded to the court's question, "Were there events in your

10  life that caused you [to] know her and her family socially during that time?" by stating "Not really,"

11  Medina could have "misunderstood the question or its focus" because "the questions were very oriented

12  toward the work relationship."  (*Id.* at 3-4.)  The court also pointed to defense counsel's failure to ask

13  appropriately pointed questions:

14       Petitioner's attorney, Mr. Boesen, asked only three questions about the
         relationship.  "You talked to the judge about knowing Mrs. Rivas at some point in time,
15       a long time ago.  What was your relationship at that time?"  Mr. Medina responded "I
         was her supervisor at work."  Since the question referred back to the court's questions,
16       it is likely that Mr. Medina was focused back into the work related aspects of the
         relationship.  As such, this response was truthful.

17
         Mr. Boesen th[en] asked "Any opportunity to share family secrets or family
18       history?  Anything about her personal life during the course of that relationship?"  Mr.
         Medina responded "Not a whole lot.  Some."  Given the casual nature of their
19       relationship, this response was truthful.  Mr. Boesen then asked "Anything in a personal
         nature you feel you *could* share with us?"  Mr. Medina responded "No."  Mr. Boesen
20       phrased the question in such as way that Mr. Medina did not feel he needed to give any
         further response.  The question does not ask whether Mr. Medina *should* share the
21       personal nature of the relationship with the attorneys and court only whether he felt he
         could share matters of a personal nature.  Mr. Boesen asked no more questions about the
22       relationship.  He did not ask whether the "no" response reflected that there was nothing
         in a personal nature about the relationship or whether the "no" response reflected that he
23       did not feel he could share those matters with the Court.  As such this response to this
         inartfully worded question was truthful.

24

25  (*Id.*) (emphasis in original).

26       As to the appellate court's fourth question, the court concluded that "Mr. Medina had some

27  justification for his nondisclosure of the full relationship because none of the questions asked on voir

28  dire focused him on the personal or intimate aspects of the relationship."  (*Id.*)  Rather, Medina may

have believed the court was only interested in the work relationship between Medina and Reith.  Lastly, the court pointed to the fact that Medina seemed genuinely surprised when he reviewed the transcript and discovered that he did not tell the court and counsel about his personal relationship with Reith, contrary to his belief.  (*Id.* at 5.)

Finally, the court answered the fifth question in the negative, finding that Medina's non-disclosure of the relationship did not deprive Rivas of his right to exercise either a challenge for cause or a peremptory challenge against him.  (*Id.* at 5.)  The court noted that the information about his relationship with Rivas was not related to potential juror bias, and defense counsel should have asked further questions if he was concerned about Medina's relationship.  (*Id.* at 6-7.)

Rejecting Medina's challenge to the superior court's findings, the state appellate court agreed that there was substantial evidence to support the superior court's conclusion that Medina did not lie:

> We find substantial evidentiary support for the court's conclusion on reference. Medina's initial, vague response of "Not really" (in response to the court's inquiry), followed by his equally vague answer to the effect there was "Not a whole lot" but "Some" sharing of Rita Reith's personal life (in response to counsel's second question) demanded further detailed inquiry about the relationship.  Leaving it to Medina to decide what he *could* share of a personal nature, then dropping the subject, simply was not enough questioning to elicit the realities of the relationship.  Otherwise, given the work-related nature of most of the questions about the relationship, it was reasonable for Medina to construe these questions as pertaining to his knowing Rita Reith at work.

(Lodgment No. 3, *In re Rivas*, slip op. D025022 at 11-12.)

The appellate court also found that substantial evidence supported the lower court's conclusion that Medina did not attempt to deceive the court when he failed to disclose his relationship with Reith.  (*Id.* at 12-13.)  Finally, the appellate court agreed that Medina was not deprived of his right to challenge a prospective juror, either for cause, because there was no basis for a cause challenge, or via a peremptory challenge, because the information Medina failed to reveal was "'not directly related to potential for juror bias.'" (*Id.* at 15.)

a.    Unreasonable Determination of the Facts (ground one)

Rivas first challenges the state court's denial of his juror misconduct claim on the ground that it was based on an unreasonable determination of the facts.[5]  (Pet'rs Mem. of P. & A. 8-17.)  As to the

---

[5]  Needless to say, Rivas does not challenge the state courts' finding that Medina and Reith had been involved in a romantic relationship, and thus the Court accepts and defers to that factual finding.  *See* 28 U.S.C. § 2254 d(2), e(1).

state court's factual determinations that Medina did not lie and that there was sufficient justification for his nondisclosure of his relationship with Reith, it is difficult for this Court to believe, as the state courts did, that Medina did not reveal his relationship with Rivas' mother during voir dire because he thought the questions were focused on his work relationship with her. When the judge asked Medina, "Were there events in your life that caused you to know her and her family socially during that time?," Medina said, "Not really." (*Id.* at 80.) Rivas' attorney noted that Medina knew Rivas' mother some time before and asked, "What was your relationship with her at that time?," to which Medina replied, "I was her supervisor at work." These two answers were, quite simply, not the whole truth. Moreover, Medina had been a juror on six or eight juries before Rivas' case. (Lodgment No. 14 at 82.) His experience as a juror undoubtedly educated him that the purpose of voir dire is to determine whether a prospective juror has any preconceived notions or biases with respect to the charges, the defendant or the witnesses who are going to testify. Indeed, the trial judge told all the juror just that before Medina was questioned. (*Id.* at 8-9.)

The state courts also faulted Rivas' attorney, Mr. Boesen, for failing to properly question Medina about the relationship and for failing to pursue Medina's answers enough to discover the relationship. (Lodgment No. 3 at 10-13; Lodgment No. 6, Ex. F at 3-4.) But that is because Medina repeatedly answered Boesen's questions by referring only to his work relationship with Reith and gave no indication that he had more than a working relationship with Reith. In this Court's view, pointing to Boesen's examination rather than Medina's misleading answers as the source of the problem is questionable.

In this Court's view, Medina's answers to these two questions were, at a minimum, misleading. However, "a state court factual determination is unreasonable [only] if it is so clearly incorrect that it would not be debatable among reasonable jurists." *Jeffries v. Wood*, 114 F.3d 1484, 1500 (9th Cir. 1997), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997). Given this highly deferential standard of review, the state courts' factual determination was not unreasonable because it is at least plausible that Medina believed the court and counsel were only interested in his work relationship with Reith. Moreover, the state court was able to observe Medina's demeanor, both during voir dire and during the evidentiary hearing, and concluded that he was "genuinely surprised that he had

1   not informed the court of the intimate nature of the relationship on voir dire." (Lodgment No. 6, Ex. F

2   at 5.)  Given these two facts, the state courts' factual determinations were not "so clearly incorrect that

3   [they] would not be debatable among reasonable jurists. *See Jeffries*, 114 F.3d at 1500.  Accordingly,

4   the Court must defer to the state courts' factual findings that Medina did not lie and that he had adequate

5   justification for failing to reveal his past relationship with Reith.[6]

6       Rivas challenges the state courts' other factual findings as well.  As to the state courts'

7   conclusion that the relationship ended acrimoniously, Reith's credibility was severely undercut by her

8   contradictory versions of the demise of her relationship with Medina.  (*See* Lodgment No. 6, Ex. F at

9   2-3; Lodgment No. 3 at 10-13.)  In her declaration submitted in support of Rivas' state habeas petition,

10  Reith claimed that she and Medina broke up because he "refused to divorce his wife and marry me."

11  (Lodgment No. 5, Ex. A at 1; Lodgment No. 7, Ex. A. at 1.)  However, at the superior court evidentiary

12  hearing, Reith testified that Medina asked her to marry him but that she refused because she did not

13  believe he would be faithful.  (Lodgment No. 2(b) at 61-64.)  In addition, although Reith claimed in her

14  declaration that her relationship with Medina ended acrimoniously, her testimony regarding Medina's

15  reaction to their breakup was vague.  (*Id.* at 84-88.)  And, as the state court noted, Reith testified on

16  cross-examination that the relationship did not end acrimoniously.  (*Id.* at 107-08.)  Accordingly, the

17  state courts' factual finding in this regard was reasonable.  *See Jeffries*, 114 F.3d at 1500.

18      The record also supports the state courts' factual finding that the relationship did not have a

19  lasting influence on Medina.  (Lodgment No. 6, Ex. F at 3-4.)  According to both Medina and Reith,

20  their relationship ended approximately twenty-five years ago and lasted only four to six months.

21  (Lodgment No. 2(b) at 56-60, 184-85.)  Medina credibly testified that the relationship was not serious,

22  that he was dating other women at the same time as Reith, he did not ask Reith to marry him, he was

23  not in love with Reith and that it was not a traumatic break up.  (*Id.* at 187-88, 193.)  He also testified

24  that there were no hard feelings on his or Reith's part.  (*Id.* at 197, 201.)  Given the superior court's

25

26      [6]  Even if this Court were to conclude that the state court's factual findings regarding Medina's
    truthfulness were unreasonable, for the reasons discussed in Section IV(B)(2)(b) *infra*, Rivas has not established

27  that he is entitled to relief.  Under clearly established Supreme Court law, Rivas must show Medina was actually
    biased against him. *See Smith v. Phillips*, 455 U.S. 209, 215 (1954).  As discussed below, there is ample support

28  for the state court factual findings that Medina and Reith's relationship did not end acrimoniously and that there
    was no lasting influence on Medina.  Thus, even if Medina's testimony was misleading or untruthful, Rivas has
    not established that Medina was actually biased against him.  *See id.*

1   / / /

2   observation that Medina was a credible witness and the lack of credibility demonstrated by Reith, the

3   state court's factual conclusion is amply supported by the record.  *See Jeffries*, 114 F.3d at 1500.

4      Finally, the state courts' factual finding that Medina's failure to disclose the relationship did not

5   deprive Rivas of his right to challenge a prospective juror for cause or to exercise a peremptory

6   challenge is also supported by the record.  (Lodgment No. 6, Ex. F. at 5-7; Lodgment No. 3 at 13-15.)

7   In California, challenges for cause are governed by the California Code of Civil Procedure.  Actual or

8   implied bias must be shown.[7]  As the state court correctly noted, there was no basis upon which Medina

9   could have been stricken for cause.[8]  The record establishes that Medina's brief relationship with Reith

10

11      [7] California Code of Civil Procedure § 203 also permits a general challenge for cause as to the following
12   categories of persons, none of which applies to Medina:

13    (1) Persons who are not citizens of the United States.
 (2) Persons who are less than 18 years of age.
14    (3) Persons who are not domiciliaries of the State of California, as determined pursuant to Article
 2 (commencing with Section 2020) of Chapter 1 of Division 2 of the Elections Code. (4) Persons
15    who are not residents of the jurisdiction wherein they are summoned to serve.
 (5) Persons who have been convicted of malfeasance in office or a felony, and whose civil rights
16    have not been restored.
 (6) Persons who are not possessed of sufficient knowledge of the English language, provided that
17    no person shall be deemed incompetent solely because of the loss of sight or hearing in any
 degree or other disability which impedes the person's ability to communicate or which impairs
18    or interferes with the person's mobility.
 (7) Persons who are serving as grand or trial jurors in any court of this state.
19    (8) Persons who are the subject of conservatorship.

20   (Cal. Code Civ. Pro. § 203) (West 2006).

21      [8] Actual bias exists if: (1) the juror says it would be difficult to keep an open mind; (2) the juror admits
bias for or against a group involved in the case; (3) the juror admits having settled opinions about the case; or (4)
22   the juror cannot assure the court s/he would decide the case based exclusively on the law and the evidence.
(*See* Cal. Code Civ. Pro. § 225(b)(1)(c).)

23      Implied bias exists if the juror:(1) is related to a party, witness or victim; (2) is a guardian or ward,
24   conservator or conservatee, master or servant, employer or clerk, landlord or tenant, principal or agent, or debtor
or creditor of a party; (3) is the parent, spouse, or child of any of the individuals named in (2); (4) is a member
25   of the family of any party; (5) holds bonds or shares of stock in a corporation which is a party; (6) had an
attorney-client relationship with a party or attorney for a party within the preceding year; (7) has been a trial or
26   grand juror or witness in a previous or pending trial involving the same parties or the same offense; (8) has been
a trial or grand juror, within the preceding year, in any proceeding in which any party in the current action was
27   a party; (9) has any interest in the action other than an interest as a citizen or taxpayer; (10) has an unqualified
opinion as to the merits of the action based on knowledge of the facts; (11) is biased for or against any party; (12)
28   is a party to an action pending in the court that is set for trial before the panel of which the juror is a member; or
(13) in a death penalty case, has conscientious objections to finding a defendant guilty. (*See* Cal. Code Civ. Pro.
§ 229.)

twenty-five years before did not bias him against Rivas.  In response to the court's question, "Do you feel that particular association [with Reith] you find yourself having some feelings of loyalty, allegiance, partiality of any sort that would affect you here?" Medina replied, "That was twenty-five years ago." (Lodgment No. 14 at 81.)  Although not precise, Medina's response can logically be taken to mean, as the state courts did, that the relationship occurred a long time ago and had no affect on him in the present.  Moreover, Medina testified at the evidentiary hearing that the break up was not acrimonious and that he had no hard feelings toward Reith.  (Lodgment No. 2(b) at 193, 197, 201.)

As the state court also noted, the question whether Rivas would have exercised a peremptory challenge against Medina had he known about his previous relationship with Reith is a closer call. There is no federal constitutional right to peremptory challenges, and thus they are governed by state law.  *See Ross v. Oklahoma*, 487 U.S. 81, 89 (1988).  In California, a peremptory challenge to a juror may be exercised for no reason at all.  (*See* Cal. Code Civ. Pro. § 231; *but see Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that jurors may not be challenged on the basis of their race).  The state courts found that Rivas had not been denied his right to exercise a peremptory challenge to Medina for two reasons.  First, the information Medina failed to disclose was not directly related to potential bias. Second, had counsel known of Medina's relationship with Reith during voir dire, "he would have had no greater reason to use a peremptory challenge than he did even without such information." (Lodgement No. 6, Ex. F at 7; Lodgment No. 3 at 14-15.)  It is true that Rivas *may* have exercised a peremptory challenge to Medina had he known of his relationship with Reith.  But this does not render the state courts' factual finding unreasonable.  Rather, given the length of time which had passed since the relationship, Medina's perception of the relationship as casual, and Medina's testimony at the superior court hearing that he did not have any hard feelings toward Reith, the state courts' factual finding in this regard is reasonable.

For the foregoing reasons, the Court concludes that the state courts' factual findings were not an unreasonable determination of the facts.  *See Jeffries*, 114 F.3d at 1500.  Accordingly, the Court will address the merits of Rivas' claim while deferring to the facts as found by the state court.  *See* 28 U.S.C. § 2254(e)(1).

      b.      <u>Application of Clearly Established Supreme Court Law (ground two)</u>

Rivas contends he was denied his federal right to a fair and impartial jury when Medina was permitted to sit on the jury that convicted him.  (*See* Pet'rs Mem. of P & A. at 17-22.)  Respondent argues the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 14-19.)

As previously noted, in *Smith v. Phillips*, 455 U.S. 209, 215 (1982), the Supreme Court stated that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias," *id.*, citing *Remmer v. United States*, 347 U.S. 227 (1954), and that "due process does not require a new trial every time a juror has been placed in a potentially compromising position." *Smith*, 455 U.S. at 215, 217.  The court further noted:

> The safeguards of juror impartiality, such as *voir dire*, and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically influence their vote.  Due process merely means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Id.* at 217.

As required by *Smith*, Rivas was afforded an evidentiary hearing during which he was provided a thorough and fair opportunity to show that Medina was biased against him.  He has not done so.  Even when viewed in the light most favorable to Rivas, the testimony at the hearing did not establish that Medina was biased against Rivas, but rather only that he failed to disclose that he had a brief relationship with Rivas' mother, Rita Reith, twenty-five-years before.  Reith's testimony was the only evidence even arguably supporting Rivas' claim of bias.  However, as previously noted in Section IV(B)(2)(a) of this Report and Recommendation, Reith's testimony was equivocal.  She stated in her declaration in support of the state habeas petition that she and Medina broke up because he refused to divorce his wife and marry her, but at the evidentiary hearing she testified that she would not have married Medina because she did not trust him to be faithful.  (Lodgment No. 5, Ex. A at 1; Lodgment No. 7, Ex. A at 1; Lodgment No. 2(b) at 61-64.)  On the question whether Medina was angry or upset at the breakup, she first testified that Medina may have been angry or upset at their break-up, then later testified that he was not angry. (Lodgment No. 2(b) at 85-86, 107-08.)  At bottom, Rivas simply speculates that Medina's relationship with Reith resulted in Medina being biased against him.  This is insufficient to establish that Rivas was denied a fair trial.

-17-

1  ///

2

3       For the foregoing reasons, the Court concludes that the state courts' denial of this claim was

4  neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See*

5  *Williams*, 529 U.S. at 412-13.  He is therefore not entitled to relief as to this claim.

6           3.      Sixth Amendment Violations (grounds three and four)

7       Rivas contends his Sixth Amendment rights were violated in two separate ways.  First, he claims

8  that the admission of Patsy Moreno's statement that she was the "getaway driver" for the robbery

9  violated his Sixth Amendment right to confront and cross-examine the witnesses against him.  Second,

10 he argues that the admission of Gloria Rivas' testimony violated his Sixth Amendment right to a fair

11 trial and to cross examine the witnesses against him because Rivas was bound to testify in accordance

12 with a "script" provided by the prosecution. (Pet'rs Mem. of P. & A. at 22-35.)  Respondent argues that

13 even if the admission of Moreno's statement was error, the state court's denial of the claims was correct

14 because any error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  Further,

15 Respondent argues that the denial of Rivas' claim regarding the admission of Gloria Rivas' testimony

16 was correct because it did not violate any of Rivas' federal constitutional rights.  (Answer at 19-23.)

17      Rivas raised these claims in a habeas corpus petition filed in the California Supreme Court,

18 which that court denied without citation of authority.  (*See* Lodgment No. 5 at 22-35; Pet'rs Notice of

19 Lodgment at 2.)  Accordingly, this Court must conduct an independent review of the record to determine

20 whether the state court's denial of this claim was contrary to, or an unreasonable application of, clearly

21 established Supreme Court law.  *See Delgado*, 223 F.3d at 982.

22           a.      Admission of Patsy Moreno's Statements

23      In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court outlined the parameters of

24 the Sixth Amendment's confrontation clause:

25           Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design
             to afford the States flexibility in their development of hearsay law – as does *[Ohio v.]*
26           *Roberts*[, 448 U.S. 56 (1980)], and as would an approach that exempted such statements
             from Confrontation Clause scrutiny altogether.  Where testimonial evidence is at issue,
27           however, the Sixth Amendment demands what the common law required: unavailability
             and a prior opportunity for cross-examination.

28

*Crawford*, 541 U.S. at 68.

1    ///

2

3    *Crawford* court did not specifically define what "testimonial" hearsay is, but did state that

4    "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing,

5    before a grand jury or at a former trial; *and to police interrogations*."  *Crawford*, 541 U.S. at 68

6    (emphasis added.)  Because Moreno made her statement that she was the "getaway driver" during her

7    interrogation by Detective Silva, *see* Lodgment No. 14, Vol. 3 at 344, it is testimonial and it would not

8    be admissible under *Crawford* unless Moreno was unavailable and Rivas had a prior opportunity to

9    cross-examine her.  *Crawford*, 541 U.S. at 68.

10    The Supreme Court, however, recently determined, contrary to prior Ninth Circuit authority, that

11    *Crawford* may only be applied to cases which were on direct review at the time it was decided and that

12    it is <u>not</u> retroactive to cases on collateral review.  *See Whorton v. Bockting*, No. 05-595, 2007 WL

13    597530 at *7 (U.S. Feb. 28, 2007)  Rivas' direct appeal was decided in 1996; *Crawford* was decided in

14    2004.  Accordingly, *Crawford* does not apply to Rivas' case.  Rather, the admissibility of Moreno's

15    testimony is governed by the test set forth in *Ohio v. Roberts*, 448 U.S. 56, 65 (1980): the prosecution

16    must demonstrate: (1) the declarant is unavailable, and (2) the statement either falls within a firmly

17    rooted hearsay exception or bears adequate indicia of reliability.  *Roberts*, 448 U.S. at 66.  Moreno was

18    unavailable because she exercised her Fifth Amendment privilege against self incrimination.  Her

19    statement was admitted as a statement against penal interest, which the Supreme Court has suggested

20    is *not* a firmly rooted hearsay exception.  *See Lilly v. Virginia*, 527 U.S. 116, 199 (1999) (plurality

21    opinion).  However, her statement does bear an indicia of reliability because Moreno implicated herself

22    when she admitted that she was the "getaway driver" for the robbery attempt, but did not attempt to shift

23    blame or implicate Rivas.

24    In any event, Rivas has not shown he was prejudiced by the admission of Moreno's statement.

25    Confrontation clause errors are subject to harmless error review under *Brecht*, i.e., whether the error had

26    a "substantial and injurious effect or influence in determining the jury's verdict."  *See Forn v. Hornung*,

27    343 F.3d 990, 999 (9th Cir. 2003), quoting *Brecht*, 507 U.S. at 637-38 and *Delaware v. Van Arsdall*, 475

28    U.S. 673, 680 (1986) (internal quotation marks omitted).  Rivas has not met the *Brecht* standard.  Even

without Moreno's statement that she was the "getaway driver," Gloria Rivas' testimony provided ample

1    support for Rivas' conviction.  Gloria Rivas testified that she told Rivas that she wanted to go to

2

3    Beltran's house and steal his drugs.  (Lodgment No. 14, Vol. 4 at 395-96, 399, 421-22.)  They were

4    going to use a gun to scare Beltran.  (*Id.* at 422, 424.)  Gloria, Roy Senteno and Rivas all had guns and

5    Rivas also had duct tape which he was going to use to tie Beltran up.  (*Id.* at 422-23.)  After they entered

6    Beltran's apartment, Gloria saw Rivas, holding a gun and the tape, standing at the bottom of the stairs

7    that led to Beltran's bedroom.  (*Id.* at 428.)  Gloria heard gunshots and a loud thud and everyone ran out

8    of the apartment.  (*Id.* at 410-11.)  Given the strength of Gloria's testimony, Moreno's improperly

9    admitted statement that she was the "getaway driver" for the robbery did not add much to the picture

10   painted by the prosecution.  It was certainly was not so important as to constitute a "substantial and

11   injurious effect" on the jury's decision. *See Brecht*, 507 U.S. at 637-38.  Moreover, Moreno's status as

12   the "getaway driver" was established by other, properly admitted evidence.  Gloria testified that Moreno

13   drove her, Rivas, Senteno and Nancy Jaime in Moreno's car to Beltran's apartment as part of the plan.

14   (Lodgment No. 14, Vol. 4 at 398-99.)  She also testified that Moreno was waiting with the car running

15   while the robbery and murder took place and that she, Rivas, Senteno and Jaime ran out of the

16   apartment, jumped into Moreno's car and drove off after the crimes were committed.  (*Id.* at 417.)

17        For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an

18   unreasonable application of, clearly established Supreme Court law. *See Williams*, 529 U.S. at 412-13.

19   Rivas is not entitled to relief.

20        b.    Gloria Rivas' Testimony

21        Rivas also complains that he was denied his Sixth Amendment right to cross-examine Gloria

22   Rivas because she was "bound to a script" provided by the prosecution.  (Pet'rs Mem. of P. & A. at 29-

23   35.)  He argues this denied him due process and a fair trial.  (*Id.*)  Respondent contends the state court

24   properly rejected this claim because Gloria's plea agreement merely required her to testify truthfully.

25   (Answer at 21-23.)

26        Gloria struck a plea agreement with the prosecution in which, in exchange for her testimony

27   against Senteno, Rivas and any other defendants, she would plead guilty to second degree murder and

28   attempted robbery and receive a sentence of fifteen years to life.  (Lodgment No. 14, Vol. 4 at 380-81.)

     If she did not testify truthfully, she would be prosecuted for first degree murder.  (*Id.* at 414.)  During

the first part of Gloria's testimony, the prosecutor became concerned that she was not testifying in compliance with her plea agreement.  After she was equivocal about what Rivas knew about the robbery plot and whether Rivas had a gun, the prosecutor asked whether it was difficult for her to testify because so many of her family members were in the audience watching her testify against her nephew.  (Lodgment No. 14, Vol. 4 at 410.)  She stated that it was not, because she was "doing what was best for me . . . [e]verybody is out for themselves right now."  (*Id.*)  A few pages later, the prosecutor and Gloria had this exchange:

> Q.  You saw [Rivas] had a gun in his hand, didn't you?
>
> A.  Yes.
>
> Q.  And where did he have the tape in his hand at that time?
>
> A.  Just holding it.  Just in his hand.
>
> Q.  What was the taping to be used for, Gloria?
>
> A.  I don't know what he was going to use it for.  Or – I don't know what was going  – I don't know, nobody talked about nothing, what we were going to use it, I don't know.
>
> Q.  Gloria, you know that if you don't tell the truth I will prosecute you for first degree murder, don't you?
>
> A.  Yes, I do.
>
> Q.  And?
>
> A.  Yes, I know that.

(*Id.* at 414.)

Following a break in testimony, the prosecutor resumed his questioning with the following exchange:

> Q.  Gloria did you have a good cry during the break?
>
> MR. BOESEN: Objection, your Honor.
>
> THE COURT: It is irrelevant, sustained.
>
> BY MR. WALDEN:
>
> Q.  Gloria, did you think it would be this hard to testify?
>
> MR. BOESEN: Objection, irrelevant.

-21-

1      THE COURT: Overruled.  She can answer that.

2

3      THE WITNESS: No, I didn't.

       BY MR. WALDEN:

4

5          Q.  Why is it hard for you to testify?

           A.  He is my nephew.

6

           Q.  How long have you known him?

7

           A.  All my life.

8

           Q.  Now, Gloria, before we broke, you hadn't been telling the whole truth to this

9      jury, had you, before we broke?

10         A.  No.

11         Q.  Why?

12         A.  Because I don't want him in trouble.

13         Q.  Why is that, Gloria?

14         A.  Because he is my nephew, I guess, and I don't know, I just feel bad.

15         Q.  Are you ready to tell the truth?

16         A.  Yes.

17
(*Id.* at 420-21.)
18
       On cross-examination, Rivas' attorney brought out the fact that the prosecutor had a conversation
19
with Gloria during the break during which he told her she was close to losing the plea deal she had made
20
because she was not testifying truthfully:
21
           Q.  In fact, Mr. Walden during direct examination, would you say, appeared to
22     get a little upset with you?

23         A.  Today?

24         Q.  Yes.

25         A.  Yes.

26         Q.  Told you you might not get your deal, right?

27         A.  Yes.

28         Q.  Scared you, didn't it?

           A.  Of course.

1

2

3       Q.  Badly?

4       A.  Yes.

5       Q.  That is when you came back in here and changed your testimony, correct?

6       A.  Yes.

7       Q.  He talked to you during the break in the hallway or in the cell?

8       A.  Yes.

9       Q.  Told you he was pretty upset with you, right?

10      A.  Yes.

        Q.  Told you if you don't get your act together and say what you were supposed
11   to say you would be in big trouble.

12      A.  Not what I'm supposed to say, the truth is what he said.

13   (Lodgment No. 14, Vol. 4 at 490-91.)

14        Clearly established Supreme Court law requires the disclosure of a plea agreement which bears

15   on the credibility of a prosecution witness.  *Giglio v. United States*, 405 U.S. 150, 153-54 (1972).

16   Additionally, as Respondent notes, the Ninth Circuit has held that "[a]n agreement that requires a

17   witness to testify truthfully in exchange for a plea is proper so long as 'the jury is informed of the exact

18   nature of the agreement, defense counsel is permitted to cross-examine the accomplice about the

19   agreement, and the jury is instructed to weigh the accomplice's testimony with care.'"  *Allen v.*

20   *Woodford*, 395 F.3d 979, 995 (9th Cir.), *cert. denied*, 126 S. Ct. 134, 163 (2005) (quoting *United States*

21   *v. Yarbrough*, 852 F.2d 1522, 1537 (9th Cir. 1988).); *accord Morris v. Woodford*, 273 F.3d 826, 836

22   (9th Cir. 2001).  *Allen*'s requirements were satisfied in Rivas' case.  Contrary to Rivas' claim, Gloria's

23   testimony does not support an inference that she was bound to a "script" provided by the prosecution.

24   Indeed, Gloria testified repeatedly that she was told by the prosecutor and law enforcement that she must

25   only tell the truth.  (*See id.* at 414, 420-21, 447, 490-93, 498, 501.)  In addition, the jury was informed

26   of the details of Gloria's plea agreement and she was thoroughly cross-examined about the agreement,

27   the benefits she would receive and her motivations for taking the deal  (*Id.* at 380-81, 414, 447-48, 457,

28   462-64, 483-88, 490-96, 500-01, 510, 515, 517-19, 525, 527.)  Finally, the jury was instructed to take

Gloria's plea agreement into account when determining her credibility (CALJIC No. 2.20[9]), that Gloria

was an accomplice as a matter of law (CALJIC No. 3.16[10]), that the testimony of an accomplice must

be corroborated by other evidence, not including the testimony of another accomplice (CALJIC Nos.

3.11[11], 3.13[12]), and that Gloria's testimony was to be viewed with distrust (CALJIC No. 3.18).  (*See*

Lodgment No. 15 at 0058, 0077-79.)

///

///

---

[9]  CALJIC No. 2.20 states, in pertinent part:

Every person who testifies under oath [or affirmation] is a witness.  You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.

In determining the believability of a witness you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness, including but not limited to the following:

. . . .

The existence or nonexistence of a bias, interest, or other motive; or any plea bargain agreement.

. . . .

The attitude of the witness toward this action or toward the giving of testimony; or the giving of false testimony.

. . . .

Whether the witnesses were coached or directed to testify in a certain manner.

[10]  CALJIC No. 3.16 states:

If the crimes of Residential Burglary and/or Attempted Robbery were committed by anyone, the witnesses Gloria Rivera and Patsy Moreno are accomplices as a matter of law and their testimony is subject to the rule requiring corroboration.

[11]  CALJIC No. 3.11 states:

A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense.

[12]  CALJIC No. 3.13 states:

The required corroboration of the testimony of an accomplice may not be supplied by the testimony of any or all of [his] accomplices, but must come from other evidence.

1    For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an

2    unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

3    Rivas is not entitled to relief.

4        4.    <u>Admission of False Evidence</u>

5    Rivas next contends that the prosecutor presented false evidence in the form of Gloria's

6    testimony.  Specifically, Rivas contends that Gloria lied about his involvement in the crimes in order

7    to preserve her plea agreement with the prosecution.  (Pet'rs Mem. of P. & A. at 35-37.)  This, he

8    argues, deprived him of a state created liberty interest, which was created by California Penal Code

9    section 1473(b)(1), and violated his federal due process and fair trial rights.  (*Id.*)  Respondent states

10   that, even assuming that California Penal Code section 1473(b)(1) creates a liberty interest, Rivas was

11   not arbitrarily denied a state law entitlement because Rivas' claim was heard and resolved by the

12   California Supreme Court.  Respondent also states that, in any event, the prosecutor did not present false

13   evidence.  (*See* Answer at 24-25.)[13]

14   Clearly established Supreme Court law holds that "[t]he knowing use of perjured testimony by

15   a prosecutor generally requires that the conviction be set aside."  *Killian v. Poole*, 282 F.3d 1204, 1208

16   (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976).)  "The same result obtains when

17   the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Napue*

18   *v. People of the State of Illinois*, 360 U.S. 264, 269 (1959.  However, the presentation of conflicting

19   versions of events, without more, does not constitute knowing presentation of false evidence.  *United*

20   *States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (citing *United States v. Sherlock*, 962 F.2d 1349,

21

22   _____

        [13]  California Penal Code section 1473(b)(1) states, in pertinent part:

23
        (b) A writ of habeas corpus may be prosecuted for, but not limited to, the following

24      reasons:

25      (1) False evidence that is substantially material or probative on the issue of guilt or
        punishment was introduced against a person at any hearing or trial relating to his incarceration;

26      or

27      (2) False physical evidence, believed by a person to be factual, probative, or material on
        the issue of guilt, which was known by the person at the time of entering a plea of guilty, which

28      was a material factor directly related to the plea of guilty by the person.

     (Cal. Penal Code § 1473(b) (West 2007.)

-25-                                                                04cv1154

1    1364 (9th Cir. 1989).)  Rather, "[i]t [i]s within the province of the jury to resolve the disputed

2    testimony."  *Id.*

3           As discussed above in Section IV(B)(3)(b), although Gloria admitted she lied during the first part

4    of her testimony, she did so to protect Rivas, not to further secure his conviction.  (Lodgment No. 14,

5    Vol. 4 at 420-21.)  Further, she testified after her admission that she was now telling the truth and had

6    been instructed only to tell the truth.  (*Id.* at 414, 420-21, 447, 490-93, 498, 501.)  There is simply no

7    evidence in the record to support Rivas' claim that the prosecutor presented false evidence in the form

8    of Gloria's testimony.  Accordingly, the state court's denial of this claim is neither contrary to, nor an

9    unreasonable application of, clearly established Supreme Court law.  *See Williams*, 529 U.S. at 412-13.

10          5.    Cumulative Error

11          Finally, Rivas claims that the cumulative effect of all the errors committed at his trial requires

12   reversal of his conviction.  (Pet'rs Mem. of P. & A. at 37.)  The Ninth Circuit has held that while any

13   single error may not have deprived a defendant of due process when considered alone, a series of errors

14   may have the cumulative effect of denying a defendant due process when considered together.  *See*

15   *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000).  This Court has determined that no

16   constitutional errors occurred at Rivas' trial, and thus there is no cumulative effect.  He is not entitled

17   to relief as to this claim.

18          6.    Motion to Expand the Record

19          Petitioner has filed a Motion to Expand the Record to include a declaration by fellow prisoner

20   Dale R. Hurd and twelve other exhibits.  (*See* doc. nos. 48, 51.)  The declaration and accompanying

21   exhibits address the timeliness of Rivas' Petition.  Because this Court has recommended declining to

22   revisit its previous determination that the Petition is timely, the Court also recommends that the Motion

23   to Expand the Record be **DENIED** without prejudice.

24          7.    Motion for an Evidentiary Hearing

25          Rivas also moves this Court for an evidentiary hearing.  (*See* Pet. at 1.)  However, the Court has

26   been unable to locate anywhere in the Petition, the Memorandum of Points and Authorities submitted

27   in support of the Petition or the Traverse upon what ground Petitioner seeks a hearing.  The Court

28   / / /

1  assumes, however, that Rivas seeks a new hearing on the question whether Medina committed

2  misconduct, as that is the only claim which appears to refer to facts outside the trial record.

3      Evidentiary hearings in 28 U.S.C. § 2254 cases are governed by the AEDPA, which

4  "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*,

5  187 F.3d 1075, 1077 (9th Cir. 1999).  The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

6          (2) If the applicant has failed to develop the factual basis of a claim in State court
           proceedings, the court shall not hold an evidentiary hearing on the claim unless the
7          applicant shows that –

8          (A) the claim relies on –

9              (i) a new rule of constitutional law, made retroactive to cases on
               collateral review by the Supreme Court, that was previously unavailable;
10             or

11             (ii) a factual predicate that could not have been previously
               discovered through the exercise of due diligence; and
12

13         (B) the facts underlying the claim would be sufficient to establish by clear and
           convincing evidence that but for the constitutional error, no reasonable factfinder would
           have found the applicant guilty of the underlying offense.
14

15  (*See* 28 U.S.C. § 2254(e)(2).)

16      The Ninth Circuit has outlined the procedure for district courts to follow in determining whether

17  to grant a request for an evidentiary hearing.  First, the Court must "determine whether a factual basis

18  exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70

19  (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078).  If not, the Court must "ascertain whether the petitioner

20  has 'failed to develop the factual basis of the claim in State court.'"  *Id.*  A failure to develop the factual

21  basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the

22  prisoner or the prisoner's counsel."  *See Williams v. Taylor*, 529 U.S. 420, 432 (2000).  The Supreme

23  Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an

24  evidentiary hearing in state court in the manner prescribed by state law."  *Id* . at 437.  If the Petitioner

25  has failed to develop the factual basis for his claim in state court, "the court must deny a hearing unless

26  the applicant establishes one of the two narrow exceptions set forth in section 2254(e)(2)(A) & (B)."

27  *Insyxiengmay*, 403 F.3d at 669-70.

28  / / /

If, however, the Petitioner "has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under *Townsend*." *Id.* (citing *Townsend v. Sain,* 372 U.S. 293 (1963).) *Townsend* identified six situations in which a habeas Petitioner would be entitled to an evidentiary hearing:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that state trier of fact did not afford the habeas applicant a full and fair hearing.

*Townsend*, 372 U.S. at 313.

The Court concludes that, given the thorough evidentiary hearing held in state court regarding Medina's involvement with Rivas' mother, a sufficient factual basis exists in the record to resolve Rivas' claim without an additional evidentiary hearing. *See Insyxiengmay*, 403 F.3d at 669-70. Moreover, because Rivas did not "fail to develop" the facts of his claim in state court, he must satisfy one of the *Townsend* factors in order to warrant an evidentiary hearing. He does not satisfy any of them. The state court's evidentiary hearing resolved the merits of the factual dispute, albeit against Rivas' claim of juror misconduct. *See Townsend*, 372 U.S. at 313. As this Court has determined, the factual determination made by the state court was fairly supported by the record. *Id.*; *see also* Section IV(B)(2)(a) of this Report and Recommendation. Rivas was afforded a full and fair hearing by the state court, and he has made no allegation of newly discovered evidence. *See Townsend*, 372 U.S. at 313. Finally, the material facts were fully and fairly developed by the state court. *Id.*

For the foregoing reasons, the Court recommends Rivas' motion for an evidentiary hearing be **DENIED**.

## IV.   CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Napoleon A. Jones, Jr. under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California. For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and / / /

Recommendation, and (2) directing that Judgment be entered denying the Petition, denying the motion to expand the record and denying the motion for an evidentiary hearing.

**IT IS ORDERED** that no later than **April 11, 2007,** any party to this action may file written objections with the Court and serve a copy on all parties.   The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **May 11, 2007**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  March 6, 2007

Jan M. Adler
U.S. Magistrate Judge